Mr. Court, John Early for the appellants. I will be delivering the recitation for the first six minutes, and then I will reserve four minutes for rebuttal by Michelle Spirtos. What is it you're going to recite? Excuse me? What are you going to recite? Well, my presentation of the case. Okay. Well, we've read all these briefs, and we have a very good idea of what's involved in these cases. Well, there are a few things that I might just grab my own. Counsel, is Ms. Spirtos a member of the Bar? Yes. And a member of the Ninth Circuit Bar? I'd understood there was some question about that in the record. She applied, and we just received the receipt for the check for her admission. She's a member of the Washington, D.C. Bar, and she applied to the Ninth Circuit. Okay. And the fee has been paid, and we have received the receipt to that effect. So as far as my understanding is with respect to that, because you sign the document that contains the oath, the oath isn't administered in court as it is in many courts, that upon the receipt of the fee, the individual would be a member of the Ninth Circuit sufficient for the purposes of argument. If the Court has any disagreement with that, I would ask that it tell me now at this point. Thank you, counsel. All right. Thank you, Your Honors. This is a case that involves a number of substantial and I think interesting jurisdictional issues, particularly with respect to the development of the law from the United States Supreme Court in the last several years. The trustee appellees have claimed that somehow the filing of the lawsuit in California v. United States somehow violated the Barton Doctrine and or the stay of Section 362. And they base that on only information that they say is contained in the prayer of the complaint. Now, when I was in law school, I recall very vividly that I was instructed that there was a big difference between the complaint and the prayer of the complaint, just as a baseline issue. They're saying that everything here that involves the ---- So who was your civil procedure professor? Professor Bernard Core. He's now a professor at American University. I went to the College of William and Mary Law School. I just want to make sure it wasn't Judge Fletcher. No, it was not. Or Judge Bybee. Or Judge Bybee. It was not. In any event ---- Or Judge Preggerson, who doesn't even remember taking civil procedure. But I did. I did by the greatest of them all, J.P. McBain. Professor McBain. Go ahead. UC Berkeley. Kind of scary, but that's where I went. Yeah. Go ahead. Well, in any event, the case, California v. United States, I think raises some very interesting issues involving jurisdiction, one of which is the court's decision in the Alton case. Recognizing that we have here a two-party case, which is something that's been obfuscated by the trustee in his proceedings, we have a case where there is only one remaining claim, which is highly questionable. Therefore, it's highly questionable whether the case should be in bankruptcy court at all. I mean, is there sufficient commerce clause justification for the application of bankruptcy law under those circumstances to maintain a two-party case? Now, when you take a look at that with respect to Alden, you say to yourself, well, no, wait a minute. If Justice Kennedy is thinking about rights that derived even before the ratification of the Constitution, wouldn't at the time of the expiration of the judgment, the state case, at least in theory. So hence the case, California v. United States. The trustee is arguing that just questioning the jurisdiction or the existence of the jurisdiction of the bankruptcy court is sufficient to invoke principles of the Barton Doctrine, and also to the effect that there was somehow a violation of the stay of Section 362. Let me get this straight. It took me a minute to follow your argument. Alden, like Alden v. Maine? That's correct. And you're saying that's relevant to this case somehow? Yes. It's pled, in fact, in the lawsuit, which is Exhibit 1. As I recollect, that's an Eleventh Amendment case. That's correct. But it involves issues that are different than the Eleventh Amendment, fundamental issues, which I found to be an extraordinary case in the sense that it talks about rights that existed even before the ratification of the Constitution with respect to the States and the Federal Government. I have never seen a case like that, quite like that. The Florida prepaid cases came out the same day, written by Justice Scalia. Those are more Eleventh Amendment cases. We're talking bankruptcy and bankruptcy court jurisdiction. That's correct. I see no bearing whatsoever. As to the issue of questioning the jurisdiction of the bankruptcy case in a variety of areas, we see that, first, there is a question as to the constitutionality of the existence of the bankruptcy case, the fact that it is a two-party case, the fact that claims of the nature of the ones that we brought, whether the Court respects them or not, are claims that should and must be heard in an Article III court. For instance, 11 U.S.C. section 157b-5 indicates that all cases involving personal injury are cases that should be brought in the district court. And there have also been some cases decided by this Court and others that indicate that the district court is appropriate for the filing of that kind of case, and that the district court is also considered the home form court. So you wouldn't be filing a case, if you filed a case someplace, let's say, in Nebraska, involving a trustee in a case in California, then there might be the potential for some issue of Barton doctrine, et cetera. Here, this case was filed specifically in the Central District of California before Judge Snyder. Therefore, there is no issue as to a case being filed in a foreign court. In our 28J letter, which was filed with this Court, we discussed a case entitled Inree Crown Vantage, Inc., 421 Fed 3rd, 963, 970, pages 970 to 971. That's a 2005 Ninth Circuit case. And in that case, the Court cites Hong Kong and Shanghai Banking Corporation v. Simon, which is also a Ninth Circuit case from 1998. In that case, the Court indicates that the district court in which the bankruptcy case is commenced obtains exclusive in rem jurisdiction over all property of the estate, and the stay does not operate against the court with jurisdiction over the bankrupt. So the issues as to the Barton doctrine and as to the stay of Section 362 wouldn't be applicable with respect to a case questioning the jurisdiction first of the Bankruptcy Court. The argument that seems to be proffered here --- Kennedy, you want to save time for your partner? Yes, I do. You've gone over that. You're going to go six minutes. I'll just take one more minute to cover it. Okay. Well, you're cutting into her time, you know. All right. You know what? I will yield to my partner. Okay. Thank you. Good morning, and may it please the Court. Peter Mastin of Gumport-Reitman, appearing on behalf of R. Todd Nielsen, the Chapter 2nd Trustee of the Bankruptcy State of Thelma-Spiritus.  First, the Bankruptcy Court's award of civil contempt sanctions for the willful violation of the automatic stay, and second, the Bankruptcy Court's award of sanctions for the violation of the Barton doctrine. Let me begin with the automatic stay. The automatic stay prohibits any asset to obtain possession of property of the estate or to obtain possession of property from the estate. Here, the contenders filed a lawsuit against the trustee outside of the Bankruptcy Court, and the prayer for relief was to obtain possession of funds held by the trustee. That's a violation of the automatic stay. The argument made in response is, these funds really aren't property of the estate, but instead funds held in constructive trust by the trustee. That argument fails for two reasons. It's irrelevant because even if it were true, the lawsuit filed against the trustee outside of the Bankruptcy Court is still an act to obtain possession of property from the estate, from the trustee, which is a violation of the automatic stay. But it's not true. There was no evidence submitted to the Bankruptcy Court in connection with the contempt proceeding to establish that the funds held by the trustee are anything other than estate property. In fact, the issue had previously been litigated before the Bankruptcy Court. The Bankruptcy Court determined that the funds were property of the estate, rejecting the constructive trust theory, and that order was affirmed on appeal and is no longer subject to further review. The question then becomes the willfulness of the violation. A violation is willful if the contender knew of the automatic stay and its actions in violation were volitional. The case law makes clear that where the contender knows of the bankruptcy case, that's tantamount to knowing of the automatic stay. Here, the Bankruptcy Court found that the contenders at all times knew of the existence of the bankruptcy case. In fact, if you look at the improper district court complaint, they identify the trustee as the bankruptcy trustee, they sue the bankruptcy case file, and they seek the relief from the bankruptcy estate, namely the turnover of its funds. Moreover, Contender Thelma Spiritus is the debtor in the case. Mr. Earley is her counsel of record in the bankruptcy case. And Contender Helene Neville had been served with pleadings in the bankruptcy case. Now, for the remedy. This Court has made clear that a bankruptcy trustee may obtain civil contempt sanctions for a willful violation of the automatic stay pursuant to Section 105A of the Bankruptcy Court. That is the section pursuant to which the trustee moved in the Bankruptcy Court. That is the section pursuant to which the Bankruptcy Court awarded the sanctions. This leads us to our next issue, whether the sanctions awarded are civil or criminal in nature. The Supreme Court makes clear that where the purpose of a contempt sanction is to compensate for damages resulting from the violation of an order, the sanction is civil. Attorneys' fees and costs are specifically recognized by cases as civil contempt sanctions. Here, the Bankruptcy Court awarded sanctions. The sanctions were based on, but did not exceed, the amount of the reasonable attorneys' fees and costs actually incurred by the trustee as a result of the violation. The sanctions imposed were payable to the trustee, not to the court. That is another hallmark of a civil sanction as opposed to a criminal sanction. And finally, the Bankruptcy Court specifically stated that the purpose of his awarding the sanctions was to compensate the trustee. Because the sanctions imposed were civil as opposed to criminal sanctions, criminal safeguards are not required, and the civil contempt sanctions require only notice and an opportunity to be heard, and that was provided. Let me now move to the Barton Doctrine. The Barton Doctrine prohibits the filing of a lawsuit against a bankruptcy trustee outside of the Bankruptcy Court for action arising out of the administration of the bankruptcy estate without the prior consent of the Bankruptcy Court. Here, the contenders filed their action against the trustee outside the Bankruptcy Court and without the prior consent of the Bankruptcy Court, and they admit in their complaint that the trustee at all times acted within the scope of his position. So we have a Barton Doctrine violation. An issue that came up later in the proceedings below is whether the Bankruptcy Court properly denied the contenders leave to sue the trustee outside the Bankruptcy Court. Now, the cases on this are uniform. As a prerequisite to obtaining leave to sue a bankruptcy trustee outside of the Bankruptcy Court, the contenders were required to establish a prima facie case of liability against the trustee to the bankruptcy judge. No evidence whatsoever was submitted to the bankruptcy judge to establish a claim against the trustee, so the Bankruptcy Court properly denied that claim. Your Honor, as to the argument raised by Mr. Erdley earlier, the issue concerning a two-party case, that's nothing that's even raised in the briefs. It's something that exists outside of this appeal, but it's not part of this appeal. And one thing I'd like to point out is this complaint against the trustee filed in the Bankruptcy Court, this is not a complaint saying, we need to find out whether the Bankruptcy Court has jurisdiction here. This is a complaint that says, District Judge, impose your will over this bankruptcy estate. Give us the money in this bankruptcy estate. Shut down this bankruptcy estate. That is another court imposing its will over the Bankruptcy Court, and as Judge Posner in the Linton case said, that doesn't work because it has the strong potential of turning bankruptcy winners into bankruptcy losers and changing the whole concept of the bankruptcy process. Unless Your Honor has any questions for me, I have nothing to add. Okay.  Thank you, Your Honor. Please support Michelle's purchase on behalf of the panel. First, I want to give this Court some perspective. This case started when I was 11 years old. I'm now 33 years old. So I've been watching Bleak House. Yes, that's right. It's worse than Bleak House. Where's Talking Horn? I'm sorry. Is Talking Horn here today? No, no. I can only just profess to you that Dickens had nothing on the hell, excuse me, that my mother has experienced. It started off as a divorce case in the 1980s. All the creditors were paid in the 1980s. In the late 1980s, one creditor, Mr. Chalant, on behalf of the Moreno judgment came in. And since the 1980s, this case has been a two-party case. What the trustee wants to obfuscate and what he cannot avoid in the bankruptcy court is that there is an order entered in the docket from April 1997 that confirms every creditor has been paid. And, in fact, when he came into this case, it was a solvent case. In fact, Mr. Elgren, who is Mr. Nielsen's former partner, personally spoke to me, was going to dismiss this case, because when I was at Georgetown and University of Virginia, which is where I obtained my law degree, I spent a considerable time lobbying the executive office of the United States trustee with Mr. Paul Bridenhagen, trying to get some resolution to this absurd case to have it closed. Mr. Nielsen came in and all of a sudden pretended that there's this class of creditors out there, refuses to acknowledge the record, the docket on record, that clearly confirms all the claims have been paid. Since this time that these appeals have been briefed, I can tell you that if you – if this case was remanded, there is no way that they could avoid that they have now been – the two-party case and the fact that all the creditors' claims have been paid has been clearly established. We've had hearings unless, let's see, October 2004, where they were faced with the docket that shows here's an order, and they couldn't address it. Basically, what this boils down to, I believe, is extortion. I've been told, if you want to get rid of this case, give us $400,000. We have a trustee here who started with a solvent estate, had enough money to pay the claim, refuses or feigns ignorance to the facts of the Basil case, which has paid the Moreno judgment and therefore reduced the amount of the Moreno judgment owed by my mother significantly, so that he can create a bigger pool of money for fees that haven't even been allowed yet. This is how absurd this case has become. And let me tell you from personal experience, the Executive Office of the United States Trustee in D.C., they'd like this case closed. They don't know what to do. They don't have any control over the Ninth Circuit out here. Let me address another issue with the Barton Doctrine. All the cases that talk about the Barton Doctrine talk about the official capacity. When you see the Barton Doctrine, it's a jurisdictional doctrine. And clearly, if you're suing in the official capacity, claiming that violations are in the nature of breach of fiduciary duty, et cetera, et cetera, then the bankruptcy court would be the forum court, and it would have jurisdiction. We do not claim that. We're claiming a civil RICO case, that they are intentionally keeping this case open for the benefit of one unscrupulous lawyer who's now been disbarred for micro-violations, Mr. Joseph Chalant. He is the holder of the Moreno claim, feigning ignorance to the facts of this case, so that they can extort money from my family. They actually had the audacity to depose my grandmother, hold her in contempt while she was in the hospital, instead of a heart attack, okay, because they're trying to take her property away. In their brief, they emphasize that I was – property was transferred to me as if that was some type of fraisal activity. The problem is, is that there are no claims to be paid. Everyone in this case is very well aware that there are no predators left except for Mr. Nielsen. Unfortunately, we've never been able to talk to Mr. Elgrin, who was the original trustee, who promised me personally that he would dismiss this case if we dismissed our appeal to the Ninth Circuit regarding the conversion of the case. We waited. We dismissed our appeal, waited for the motion to dismiss. Excuse me. To come, nothing came. Mr. Elgrin all of a sudden fled to the Philippines. And since that point, we have had a new changing of the guard, and we haven't been able to get anywhere. This case is a case of the court. Counsel, why don't you have a remedy in the bankruptcy court? We do. I can personally tell you that for almost over a decade, my mother's counsel, who is now us, have made numerous requests to dismiss the case. Judge Ahart will not dismiss the case. Have you requested a change in the trustee? Yes. Getting nowhere. I mean, this is why we do it. Do you have a remedy on – when those are denied, do you have a remedy either in this court or in the BAP? This is a problem. Your remedy is appeal. How many years are we going to appeal? My mother's going to be dead. She has breast cancer. I mean, I am doing these – I am doing this litigation because, literally, this is a case that has come – that is my childhood. I am 33 years old. I should be allowed – my mother should be allowed to rest in peace. Unlike any other bankrupt person in the United States, she has paid every creditor in full. And it's absurd. She's being held a hostage, basically corrupt trustees, and Mr. Challant, whom the California State Bar agrees with with us, he has been disbarred for micro-violations. And that's what we allege the Moreno judgment was. Now, Moreno judgment has been capped at $414,000, and that's in the plan. It's another fact that Mr. Nielsen pretends to have no knowledge of. But the fact of the matter is it was capped at a certain amount. Payments were made from the Basel estate, reducing the amount to less than $300,000. And if Mr. Nielsen and his attorneys had actually done their homework or pretended to do their homework because they claim they have no knowledge of public records, they have no knowledge of records from the executive office or the trustee, they can't see orders in the docket, see the claims are being disallowed, if they had done that, they would have realized they started with a solvent estate, and they have made it insolvent by – by demanding attorney's fees that aren't even allowed. If that's not extortion, I don't know what it is. Can I just get a drink of water? Counsel, let me stop you for just a sec. Well, you're getting water. I just want a drink of water, yeah. Yeah. Okay. I'm still trying to – I'm still trying to figure out why – why you can't appeal this up through the bankruptcy system. We have. We have so many appeals. Okay. And you've been – and been to where? Those go to the BAP? Do they come here? Some of them have gone to the BAP. Then they come here. And what happened when they went to the BAP? The only one that went to the BAP, actually, is regarding child support. And I want to address that because – Okay. But I'm – I'm – okay. Hold on, Counsel. I know you've got – I know there's a lot of history. Yes, there is. I'm not sure I want to hear all of it right now. Right. But with respect to the – to the idea that this is a solvent estate, that you have one creditor left, and that – and that all the claims can – can be paid and it ought to be closed, where is – why can't you appeal that, or have you appealed that? Well, that was the issue. When the case was converted, Mr. Elgrin, who was Todd Nielsen's partner, realized and had a resolution that, oh, my, oh, my, this is a two-party case, and there's no need for this case to go on. There's money to pay the claim. I'm going to dismiss the case. So in return, we had an appeal to the BAP appealing Judge Ahart's order converting the case, because he converted it in 2001 at the request of Mr. Shallant. In exchange for our dropping the appeal, Mr. Elgrin promised he would dismiss the case. So we – we filed a motion with the BAP, dismissed our appeal. We waited for Mr. Elgrin's motion to dismiss our case, waited months and months. Nothing happened. Did you have that agreement in writing? Yes. Yes. And the BAP considered a motion. Nancy Goldman, who is Mr. Elgrin's attorney, worked with us. If this case ever got remanded, there's no doubt that the proof is – that's why they don't want to get to a jury trial. The proof is overwhelming. Of course, Nancy Goldman, their attorneys, we all worked this out. And all of a sudden, Mr. Elgrin flies to the Philippines on a missionary, you know, mission, I should say, and his partner, Mr. Nielsen, feigns ignorance. He just – he says, you know, I'm not going to close this case. And then continues down the road. I mean, I could – you know, obviously, I can't try this case in front of this Court now, but if this case ever got to a trial, I could – I believe that the evidence and I think they know the evidence is so clear that they aren't – this isn't a mistake. They know. I've – I mean, I have written to them, showed them the dockets, the records, and they know what the score is. They know the claim's been paid. But they want to pretend that they haven't been paid. Even Judge Ahart, in October of 2004, we had a hearing on another matter of this case that's not before this Court, had to finally, you know, bring this to the open, and they couldn't answer. I mean, they were forced to contend with the fact that here are the orders of the Court. No. These predators have been paid. And they've changed their story, and they've changed their story. There is no estate to administer. This is not a lawful estate being administered. This is a 74-year-old woman who made the stupidity of filing, you know, for Chapter 11 in 1984, because in the divorce, she got business property, and then the – her liabilities to the Moreno judgment became an issue on appeal that this Court decided in 1995. The reality is, though, that she made a decision 22 years ago. And since that time, she paid her creditors in full in the 80s. The rest of them were paid in the 90s. Plan confirmed. This case should be dismissed. But the problem is that the trustees won't make money if it's dismissed. Mr. Schlant doesn't make money if it's dismissed. Because by converting the case and keeping my mother in bankruptcy, she has no standing to defend herself. So when we finally filed a RICO suit in the district court, which we've led – I want to emphasize this – we alleged unofficial capacity. Because I think the case law is very clear, and it goes – it's briefed very well, but if you look at the case law that goes back even from the Ninth Circuit, In re Letter – In re Vrooman, citing Bunvey Mills, if you look at every practice guide, from Collier to American Jurisprudence, we just filed a 28-J letter, which provides you with updated practice guides that are relevant. Every one of them states and qualifies that when you sue a trustee in an unofficial capacity, it doesn't matter if it concerns an administration of a bankruptcy estate. If you're alleging that the trustee is either personally liable or acting in excess of his authority, you don't need permission from the Bankruptcy Court. Which, by the way, this case – this Court, excuse me, in the Ninth Circuit, has a case called In re Cheerlink Ranch. It goes back to 1989. Citation is A86, F2nd1233, and it holds that you can't violate the state in the district court, because you can't violate the state in the forum court that has jurisdiction over the Bankruptcy Court. They – regarding the child support issue, that is not true that the BAP determined that the child support is part of the bankruptcy estate. They determined that my mother pledged the child support. But the issue as to whether it was child support or not obviously has to go back to the Bankruptcy Court. That's my child support, actually. And no one wants a determination as to whether it's child support or not. It doesn't matter if my mother pledged it. It's in a constructive trust. State law is very clear. It doesn't – you cannot alienate or, you know, I mean, you cannot sell or convey child support because it's in trust for the child. So it doesn't matter what my mother did. It doesn't matter that she put it in her plan because she was an idiot or her lawyers put it in a plan. It's irrelevant. And that was one of the issues that we wanted to decide in the Sirico case. But I think what this Court – why this case is very important, why this Court should clarify the distinction between the official and unofficial capacities, because if you look at 11 U.S.C. 323, annotated – I'm sorry. Why don't you just bring it up there? Yes. Bring it up here. If you look at 323, annotated, which I did. Well, we did before we filed this complaint. You're making me thirsty, too. I'm sorry. It's all right. I'm sorry. If you look at the annotated section in West, Lexis, and you read 323, capacity to sue and be sued, such two cases, Inri Kishani and Inri Reich. You read Inri Reich, which I believe is in our opening brief on many pages, and it clearly states that you don't need leave in any capacity. Obviously, Inri Kishani, which is the BAP opinion, disagrees with the holding of Inri Reich, but the point is, is that to be in contempt, it has to be a clear and definite order. So even if the Ninth Circuit wanted to say, you know what, we disagree with the other circuits, because if you do take an analysis of all these cases, and again, if you go back to Leonard v. Vrooman, Von V. Mills, these are Ninth Circuit cases from the And that is a distinction that I think has alluded not only this Court in its most recent opinion, Inri Vantage, because, again, it was talking about the official capacity of the trustee. But you're suggesting here that you sued the trustee in his unofficial capacity. Yes. Yes. And their argument is, well, you know, it's just really a RICO case disguised. But the point is, is that if that's the case, let the inherent, you know, pleadings in practice that go on in a district court, let that resolve the issue. If we cannot plead a RICO case, if we can't state a cause of action, surely the district court will dismiss. But they don't want us to get to that point, because it's Barton doctrine here, judicial immunity there, and they don't have judicial immunity, because this Court, Inri Castillo, and other cases are very clear that immunity only is conferred when you get prior approval to do what you're doing. The trustee sued us within three days of our suing them in, I believe, a very retaliatory action. And we had filed this district court case, and somehow Kirkland & Ellis law firm faxed them a copy before we even served them. And within three days, we had a barrage of litigation going on. And all we want is out of the case. We just want out. I want my mother to be able to die, not a bankrupt. I mean, they've already – I mean, to have – I can't even express to you, to have a 94-year-old woman from Greece who has worked in the steel mills – I mean, you know, my parents are from Greece – built this country up like every other immigrant, to actually have the audacity to conduct discovery and subpoena her and hold her in contempt, and then enter a default judgment against her while she's in the hospital, okay, which – and then cause her to have a heart attack. To me, it just blows my mind. It actually very much reminds me of the case that we were just discussing before with what is the government doing. I've certainly, as an individual, have lobbied the government as much as I can.  I was at UVA, talked to every professor I could about this case, actually argued a published opinion when I was a law school student before Kaczynski regarding the Moreno judgment and the renewal issue, which is a different issue. But I've done everything in my power to do so. The problem is, is that no one really cares about my mother if she is swept into the wayside and she dies as a bankrupt. And these trustees need to be stopped. I mean, I think the issue with the unofficial versus official capacity that needs to be clarified is that if I can't figure it out – and I'm reading 323 annotated, I'm reading the practice guides, and I mean, is Collier wrong? Is American jurisprudence wrong? They clearly state, but you don't need leave from the bankruptcy court when you sue in the unofficial capacity. And the unofficial capacity is not when it has nothing to do with the bankruptcy estate. I'm not referring to, let's say, a trustee running me over in the street, and he just happens to be a trustee. The point is, if you're going to surcharge the trustee personally or you're alleging that he's acting beyond his prescribed duties in 11 U.S.C. 704, well, then you're making claims that the bankruptcy court would have no jurisdiction over a clearly constitutional issue. Counsel, if you were suing him in his unofficial capacity, if you were suing him because of an automobile accident, because his dog trampled your flowers or something, that would be fairly obvious. But we're here. It's very clear that what is at issue is the bankruptcy estate. It's a very difficult argument to make that you've sued him in his unofficial capacity. Well, no, actually, it's not, see, because if you go back and look at Leonard v. Berman and Bumby Mills, they recognize that unofficial capacity doesn't mean that you're not concerning the bankruptcy estate. What you're alleging is that the trustee has gone overboard. The trustee has exceeded his authority, and therefore, he's going to be surcharged personally. That's the confusion, I think, that you get. And I think if you look in the briefs, and I'll give you the page numbers, actually. Well, let me see. If you look in the page numbers, and I think if you read all the practice guides that we've given you in the 28-J letter, and I really do ask this Court to look at Leonard v. Berman and Bumby Mills, and you follow the traces here, they clearly recognize that when they mean unofficial capacity, they simply mean you're surcharging the trustee personally. He's exceeded the scope of his authority. They are not referring to the trustee being in the street, you know, running you over as a layman. And that's the difference. And the point is, is that if you are in the district court and you're alleging unofficial capacity, let the district court decide whether you are pleading a RICO cause of action. Clearly, if we plead a RICO cause of action and we can't state a cause of action, what's the district court going to do? It's going to dismiss. But the problem is they want to frighten you into never getting to that point, because they know if any of these facts got to the light of day, if the jury trial ever saw what was going on, it'd be all over with. And let me tell you something. I've gotten a million e-mails from people about Todd Nielsen, the trustee, from his dealings with Reed Slatkin, and much greater bankruptcy cases than this one. And the allegations that we're making are not plucked from our wild imagination. He has quite a reputation. The problem is, is that he just figured in this case he was going to shake down some And, you know, that's really what it boils down to. And if we could ever get to a jury trial, I think the evidence would prove exactly what we're alleging. And that's what they don't want you to get. And I want to just one final fact regarding compensatory damages. If $50,000 for filing a 112b6 motion is compensatory, then Dunport-Reitman has to be the most expensive firm in the city, because the case law, and let me refer to the page 24 and 25 of Appellant's opening brief, there's plenty of case law that's very recent from 2001. For example, In re. Henry, the citation 266BR45. That's a district court case from 2001. Egregious and willful conduct violating automatic stay warranting $6,000 in compensatory damages. In re. Boland, 295BR803, another district court case, 2002. $5,600 awarded in compensatory fees for violation of the automatic stay. Ninth Circuit case, 2002, called Escanos and Adler v. Ledean, 309F3-210, Ninth Circuit, 2002, on page 25 of Appellant's opening brief. And guess what? They got $1,000 in compensatory fees awarded for egregious violations of the automatic stay, which, once again, if you go back to the case in re. Cherlink, it's a legal impossibility when you're sitting in the forum court. So for them to say $50,000 for 112B6 motion that you couldn't even avoid because they also want to avoid the fact that in the record, the day before Judge Ahart held my mother, my husband and everyone in contempt, the district court had dismissed the case, therefore making a legal impossibility. How could we comply if the case is dismissed? So, you know, as far as there being compensated for $50,000, I find that to be a far stretch, and I think it's a very thinly veiled disguise of punitive damages. And again, if it's compensatory, well, they must be much, much greater than the rest of the plebeians that do bankruptcy law in front of this Court and everyone else who's been paid, you know, $5,000 average. So pretty much since I think, you know, I've taken up this Court's great much of this time, I do urge the Court to please review our 28J letter and all the practice guides that state that they distinguish between the official versus unofficial capacity, because even if this Court wants to rule that we were wrong, clearly, if you have practice guides and 323 annotated and all the case law that has this distinction, it couldn't be a clear and definite order. So that is what I basically look like. And I'd also want to ask this Court to consider perhaps reversing or remanding with instructions to dismiss the case under 11 U.S.C. 305, which is the Bankruptcy Court's inherent power, and I would assume the Ninth Circuit has the inherent power to dismiss this ridiculous case and just let my mother go on with her life, the few years that she has left. Thank you. Well, Mr. Nielsen, what do you got to say for yourself? Have all the creditors been paid? They have not, Your Honor. Who hasn't been paid? There is at least one creditor who remains unpaid. Who's that? It is a woman by the name of Irene Moreno for her son who was damaged physically as a result of thelma spiritus' husband's malpractice. Is there anybody else besides the Moreno claim? It's unclear to me at this point, but they are. They are very small. There is a handful of three that I personally have not been able to confirm one way or the other. What do you mean it's unclear to you? I'm sorry? What do you mean it's unclear to you? It's unclear. This is a very old case. We've been unable to locate these people. Well, how long do you get to look for them? Well, they have a claim against the estate to the extent they do. We have an option of objecting to that claim. The only claim that you know of then is the Moreno claim. That is certainly. And what's Mr. Chalant's, what's his relationship to the Moreno claim?  Does he now own the claim? To the best of my knowledge, no. But I don't have any control over whether he signs the claim or not. So the only one that we have now that is outstanding is the Moreno claim, which would be perfectly consistent with what Ms. Spiritus just told us. That is at least one claim, yes. What's the value of that claim? The claim was based on a judgment in the $800,000 to $900,000 range. I don't recall the exact amount. What range? $800,000 to $900,000, Your Honor. Uh-huh. And there are, after Ms. Spiritus filed bankruptcy, two to three years later, Mr. Spiritus, Dr. Spiritus filed bankruptcy. Ms. Spiritus' estate was determined by, I believe, Judge Ahart to be liable for at least half of the amount of the judgment against Basil Spiritus. Certain payments were made from Basil Spiritus' estate, but not in excess of more than half of what was owed. So that remains a community debt that's liable, both states are liable for. Well, but I mean, so how about say $800,000 or $900,000? Is that what you're telling us? Yes. Is it $800,000 or $900,000? It's in that range. I can't give you the exact number. For which Ms. Spiritus is liable for half? Correct. Okay, so she's liable for roughly, we'll call it $400,000. $400,000 plus thousand dollars. And how much is in the estate now? There is approximately $380,000 presently in the estate. Okay, so what has to be determined here? What has to be determined in this appeal? No. What has to be determined in the bankruptcy proceedings? Why is it taking 20 years to resolve this? This is taking 20 years to resolve because up until 2001, Ms. Spiritus was in control of this estate as a debtor in possession, not a trustee. Mr. Nielsen came into this case 2002 to 2003-ish, somewhere in there. When he entered into this case, the vocal creditor, Moreno, was contending that Mr. Nielsen should assert claims against the bankruptcy state of Thelma Spiritus' former trustee for negligence. At the same time, the Spiritus camp was asserting, hey, this is now a two-party dispute and as a matter of law, you have to dismiss this case. We came in to look at these issues. Another issue alleged by the Moreno group was a piece of real property that was identified in the plan was to be used as part of the fund the plan, including paying the Morenos. You're slurring some of your words and maybe my hearing is going bad. I'm sorry, Your Honor. I missed the last three sentences. Okay, let me go back. Another issue when Mr. Nielsen was appointed was the allegation by the Moreno group that a piece of real property that was identified in the plan of reorganization as being to be used and liquidated to pay off the Moreno claim and other creditors was absconded with. And what we needed to do as the trustee, what the trustee needed to do, is determine whether these allegations are correct. The trustee obtained Rule 2004 orders for the examination of Thelma Spiritus and Polymnia Vuis. What we determined was the property identified in the plan of reorganization as property of the estate, owned by, entitled by Thelma Spiritus. After the plan was confirmed, the Polymnia Vuis filed a... You have to enunciate each word for me. I apologize, Your Honor. It's a claim, a claim, a claimpletos, you know. The plan of reorganization identified this parcel of property as property of the bankruptcy estate. It was titled in the name of Thelma Spiritus. After the plan was confirmed, Mrs. Spiritus' mother filed in the state court an adverse possession claim to quiet title to the property. A default judgment was entered in favor of the debtor's mother. So, taking title to that property. Title to that property was then transferred to the debtor's daughter, Michelle Spiritus, who you heard argued here today. We determined those were the facts, and given those facts, we filed an adversary proceeding in the bankruptcy court to recover that property. Judgment was entered in favor of the trustee by the bankruptcy judge, and that is another issue on appeal. You know, it's not in the record, but... On appeal where? To the manor or to here? It's presently on appeal to the district court. Okay. After the district court, it will no doubt come here. There are at least 18 appeals having been filed by the Spiritus. Was there title insurance, title insurance obtained on that default judgment? I don't know. It was handled by someone ostensibly acting on behalf of the debtor's mother. Well, you know, you can make an adverse possession claim, and you show the tax receipts, five years, open a notorious possession, and all the other elements, and you can get the title company to insure title in the adverse possessor. I did that once, so I know. I don't know whether... Did that happen here? I have no idea. It predated the trustee, and it wasn't handled involved in the bankruptcy case. It was simply a matter of someone, a close relative of the debtor, outside of the bankruptcy case, doing something to obtain possession of something that was to be liquidated for the benefit of the bankruptcy estate's creditors. Well, why did it go by default? That's a good question. Why would it go by default? The debtor, everyone knows where the debtor is. The debtor, who was supposed to liquidate this property, and use it to pay her creditors, you know, she didn't want to do it. Keep in mind that these were originally one parcel of property purchased by the debtor and her husband that were subdivided in contemplation of this plan of reorganization. The debtor's house is on one property. The guest house is on another property, was now the second parcel that was adversely possessed. What about the homestead? No homestead? There's no homestead when the property is fraudulently transferred. And that's the allegation that was in the complaint. Counsel, if there's $300,000 plus or minus in the estate, and the claim is $400,000, does that mean that we're only talking about a $100,000 difference here? The question is, at the time, the claim of the Morenos would accrue interest. They are entitled to interest on their claim. So how much more are you talking about? I can't give you a number, but let's assume it's $100,000. So another $100,000. So we may be talking about $200,000? Well, sure. Let's assume it's that number. What we have here is a situation where Moreno, and let's assume it's $200,000, is owed $200,000 more than what's in the bankruptcy estate at the time. There are allegations being made from two very litigious and vocal sides here. The trustee hires counsel to say, figure out what's going on. And as soon as we start asking questions, we serve subpoenas pursuant to the bankruptcy court's authorization in order to do so. To determine, what happened with this real property? Where did it go and why? That's when this RICO suit was filed. Putting the trustee in a defensive position. Your Honor, this is a suit where the Spiritos has alleged, they sued not only the trustee, partners in my law firm, they sued the United States trustee, Maureen Tai, they sued two sitting state court judges, Carolyn Kew and Barbara Myers, the Los Angeles Superior Court, all alleging some sort of a massive conspiracy whereby some records would disappear from the case. This is all a conspiracy to take away property from Thelma Spiritos. This became a very serious action. Where's your partner that was in the Philippines? It's not my partner. It would be my client, Tom Nielsen. He's the trustee. His former business partner was originally appointed by the Department of Justice as the trustee of this bankruptcy estate. Mr. Nielsen is Mormon. He went on a Mormon missionary. They had a goodbye party for him and he went away to the Philippines for that mission. Mr. Nielsen did or Mr. Nielsen's partner? Mr. Nielsen's a successor trustee. When Mr. Nielsen left on his mission... My recollection, and it's just recollection, is approximately 2002-ish. Has he come back? He's back. Is he back in the firm? The firm no longer exists, as far as I know. Who is it who's been disbarred? Mr. Chalant. Excuse me. Mr. Chalant was the lawyer for Irene Moreno, who is the custodian for her brain-damaged child. The custodian for who? For Irene Moreno. It's in her name that the claim exists. She is the custodian for her brain-damaged child. I see. She holds the judgment as custodian. Did Dr. Spritos, he had malpractice insurance? I assume so. I don't know. Why don't you know this? The claim has never been paid. Part of it was paid, wasn't it? There was some payment from the Basil Spritos estate. Well, maybe he had insurance on it. If it did, it didn't pay in full, because I can tell you that there remains an unpaid balance due in the Basil Spritos estate to Irene Moreno. The same in the Thelma Spritos estate. Your Honor, you hear counsel in this case saying the trustee is running up fees. Well, what would they say if my firm came in and decided to go back to 1984 and review every record, every document, every order, and attempt to relitigate orders that were already in existence? We come into a case, Mr. Nielsen comes into a case, and he ticks it up where it is. The orders that have been made, the payments that have been made, they've been made. So Nielsen came into the case because the other guy went on his mission. Correct. And Elgin comes into the case as trustee in what year? I want to say it was approximately 2001, 2002. Because prior to that we had a debtor in possession of the estate. Correct. So Mrs. Spritos was in possession of the estate until roughly 2000? 2001-ish. 2001. Mr. Elgin's appointed. He's in the case for a couple of years. He leaves to go to the Philippines. Mr. Nielsen takes over. That's a close approximation. Mr. Elgin was not a member of your firm? Correct. Mr. Nielsen and he were business partners or law partners? Business partners. They are accountants. They are not lawyers. They are not part of my firm. So what took so long to bring this to a conclusion? To bring which aspect, Your Honor? This bankruptcy case. This bankruptcy case, when we first looked at it, we expected to take a year to get done. What kept this case open is, one, this very lawsuit. The very lawsuit that was filed in the district court against the trustees, all these judges, the U.S. trustee, my firm. That's something that the case can't be closed unless that is resolved and done. Another thing that's keeping this case open... There might be merit to that claim. There is no merit to the claim. How do we know that? Because no evidence has ever been presented to show that there's any merit to the claim. Well, at what stage was this dismissed on the complaint? This was dismissed. And understand where we are here. We're not talking about... This isn't the lawsuit filed in the district court. This is not an appeal from that. This is an appeal from the bankruptcy court's order holding them in civil contempt for filing the suit outside the bankruptcy court and not coming to the bankruptcy court. Was the dismissal itself appealed? The dismissal itself... If it was appealed from the district court, it was dismissed as interlocutory. The case is going forward as to Mr. Chalant and Ms. Moreno, who are also named. This is a situation where the Spiritosis family members have brought RICO complaints. It seems to be somewhat an M.O. bringing RICO complaints against opposing counsel. Well, a lot of people are doing that now, aren't they? It's not uncommon. Mr. Yagman brings them all the time. That's Mr. Yagman. But he's been successful. I'm not aware of Mr. Yagman bringing RICO complaints against opposing counsel. That may be the next case. Well, that may be, but... You know, you have what you have. One last issue I would point out. They brought up the issue of Indermay-Reich. Indermay-Reich, I'll point out, is not a Barton Doctrine case because if you look at it, it's a case filed in the bankruptcy court. Of course you don't need to leave the suit in the bankruptcy court. It's not the Barton Doctrine. Leonard v. Verumens is a decision from this Court where they say, you don't need to leave for this ultra-buyers act. Let me read you a quick paragraph from this. Let me ask you, all this property, where is this property located? Whittier, California. Now that's all gone up, is it? Maybe. It's a questionable value, and I'll tell you why. The parcels were one parcel. How big are they? I don't know. One has a significant five, six bedroom house in it. It's a smaller parcel. The other one has a smaller guest house on it. It's a larger parcel with a hillside. From what I understand, I've never physically seen the properties. It's my understanding that to get to the parcel that the trustee now has judgment and title to, you have to go through a common driveway, I believe. Most importantly, two things most importantly as far as the value of that property. One, if the trustee were to try and sell this property, he would have to disclose to a buyer how he came to title this property and that these people still live next door in the house in that at least at one time, and I'll tell you right now, I don't know whether this determination has been appealed or not, Ms. Spiritos' daughter, the debtor's daughter who's here today, was determined to be a vexatious litigant and her husband was determined to be the instrumentality through which they operated. Like I said, there are... There's the last few words.  Give him a drink of water. Well, be a humanitarian. As I told you, there have been no less than 18 appeals filed in connection with the Spiritos Bankruptcy Estate. They have sued multiple judges. Okay, if you didn't have all that, the property would be worth a lot of money. The estimate we had by a realtor, multiple realtors doing drive-by estimates of the property without seeing the inside would be approximately $500,000. You know, the median price of property  This is what happened in Whittier. The mountains overlooking the orange groves and the avocado groves. You've got two big parcels of property. The estate only has one. It's the hillside, relatively undeveloped property with the small guest house on it. This isn't the large house. No, but it's the land that has some value. Right, it has some value. But, do you want to buy the lawsuit? I don't want to buy the lawsuit. I don't even buy green bananas. I'm not buying anything. So, is it sellable? Yeah, I think it's sellable. Is it a significantly diminished value because of the circumstances in which we find ourselves? Yeah, I think so. I think the court first time. We're fine, thanks. Okay. Well, that takes care of both of these. No, we have one more. What? Yeah, okay, go ahead. What he's not explaining to you is that my mother had a plan of reorganization in 1996. My grandmother, who is dead, lived in the guest house for 30 years. Actually, my father brought the guest house over for her. She paid him. She lived in it, paid the taxes, et cetera, et cetera. In my mom's plan of reorganization, she purchased, through the absolute priority rule, her house. The back property was adversely possessed by my grandmother for a very good reason. She wanted to keep her house away from the bankruptcy fiasco. When she was dying, because I was living there, she transferred it to me. But it's not a fraudulent transfer because you can only have a fraudulent transfer if the estate is owed money. And at the time, before Mr. Mass and his attorneys came in, and my mother was a debtor in possession at the time, there was almost $400,000 to pay Mr. Shallant. And what they're not letting you know is that if they did an accounting of the payments from Dr. Spiritus's bankruptcy estate, dollar for dollar it reduces the Moreno claim. So if they actually did an accounting, the Moreno claim at the time, before the case was converted, was owed no less than $280,000. There is no post-petition interest because in the plan of reorganization, Mr. Shallant, on behalf of Ms. Moreno, expressly waived the right to any post-petition so that we could, and in exchange he would get payment in full of his claim, which was $414,000 max, not including the offsets from the payment of Dr. Spiritus's estate. And the reason it was prolonged was because we had a renewal of judgment appeal going on that was just decided in 2000. After that case was decided by Judge Kaczynski, who published the opinion, then the case was converted. So you need to understand that, you know, that these issues on appeal, and they are in the record, somewhat offset the allegations that Mr. Mastin is trying to explain. Because if you don't understand that, then of course it looks like, yes, I'm receiving property and we have something to hide. We didn't have anything to hide because we didn't think we had anyone to deal with other than Mr. Shallant, who knew his claim was going to get paid. It was only until they came onto the scene and claimed there wasn't enough money to pay them, them first, with an unallowed administrative claim of they've requested $407,000 that the estate became so-called insolvent. And these are issues that, on remand, could clearly be resolved in the Bankruptcy Court, and no one but Mr. Mastin has a question about it, because so when your grandmother got that piece, you know, it's hard for you to visualize, by adverse possession. Did she get a title policy with that? And my mother didn't respond. Who's going to defend my mother? There's no law that says my grandmother can't exercise her legal rights under State law and adversely possess her property. And the plan only provided that. She got a title. Yes, absolutely. And the Court forced her to work up the judgment. She had to prove that she paid the taxes, lived there for 30 years. And the fact, what happened was basically my mother's attorneys put the plan, put her house in her plan of reorganization, which they never should have done. And if you read the plan, which Mr. Mastin does not do, the plan explicitly stated that the property would only be sold or refinanced if needed. At the time, there was no need to do so because Dr. Speros's estate had made significant payouts, leaving the Moreno claimant less about 280,000 owed from my mother's estate, if you properly did the calculations. Well, did your grandfather have or your father have malpractice insurance? No. This is a horrific case that goes back to 1983. And actually, the individual who has brain damage is actually a graduate from college. So, you know, this is a case where my father did not have malpractice insurance. He was actually a professor at USC. He was a very brilliant doctor, but he had a very big ego. And he left the child in the – he delivered the child. The child was left in the hallway. He didn't call the pediatrician, and the child resurrected himself and supposedly had brain damage. Now, when the case was tried in 1983 by Mr. Chalant, the medical malpractice guru who has just recently been disbarred, it was determined that the child would have permanent brain damage. I can tell you the child does not have permanent brain damage now and actually graduated from college, but, you know, it's a collateral issue. You can't go back and attack a judgment. But Mr. Chalant is a key figure. It's because it's Mr. Chalant who's kept this case open, because he's never wanted to get payment on his claim. He just – he's – Mr. Chalant is worth probably about $50 million, literally. If you did a property roll and saw how much money he has. But he has had this thing with my father going back to the 70s, and he just felt that with my mother, you know, he was going to get what he wanted to get. And what he's really been trying to get is the house, because, see, the house, if you put the two lots together, it's four acres in Whittier, see? So I think that – I think – and another thing that I want to point out, even though we have the Allstate case, it's very interesting that they didn't want to come and take the house until after we had the Allstate fire and we had causes of action related to the house. Because they actually tried to sue my mother in contravention of her plan, claiming she didn't purchase her house under the absolute priority rule, and they lost that issue. So if they had their way, they'd have both pieces of property. So I just wanted to clarify that. Because, you know, you listen to Mr. Mastin, it does sound, you know, horrible, but everyone – you know, everyone who's interested, the bankruptcy court, the former trustees, they all knew the facts. That's why they were going to dismiss the case. So that's all I have to say. Thank you very much. But Mr. – yeah, Mr. Shallon has been disbarred. Yes, for micro-violations. For what? Micro-violations. The escape bar has determined that for the majority of his career, he has used hybrid fee agreements to circumvent the micro-caps on attorney compensation. Now, we've always alleged that Mr. Shallon – You mean the $250,000 cap? Mm-hmm. And that's who he's been disbarred for. And so we've always alleged, but we've never been able to have the right to do discovery because either Judge Ahart's blocked us or once the case was converted, we don't have a right to do anything unless we sue every new case. We've always alleged that Ms. Moreno was paid long ago, and in fact, we have very good evidence of that from Mr. Shallon's former attorneys, and that the real person in this case is Mr. Shallon, who has a pathological personal need to destroy my mother and her family. This goes back to a fight that he had with my father way back in the 70s, and it's gone on my whole life. So, I mean, I think that's very relevant. They want to downplay Mr. Shallon's being disbarred, but the State Bar believes that his modus operandi in all of his cases is to come up with hybrid fee agreements, which allows him to circumvent the caps of micro for attorney compensation and allows him to basically collect all the money. And Mr. Shallon has received almost $700 and some thousand from my dad's estate. Ms. Moreno, from what I understand, and I think evidence would prove this, was paid long ago. She's not really a party here. It's just Mr. Shallon. So, they don't want to investigate that, though. They claim that's irrelevant. But, you know, we had a mediation before Judge Trevisan. He indicated, you know, he asked them, why aren't you investigating this? It's very relevant. But to them, it's irrelevant. So, you know, I think our allegations regarding the conspiracy with Mr. Shallon to keep this estate open to prevent my mom from having standing of suing anyone, I think might have some weight if we ever got to that point. But the Morenos are not interested in this at all. No. She's just a puppet. And we're making those allegations a very firm foundation. Obviously, the State Bar agrees with us, and there's a lot of witnesses that work in Mr. Shallon's office who will testify, if possible, that that is the case. Well, who owns the judgment? Mr. Shallon. Is that in writing? No. Well, we don't know if it's in writing because, see, the hybrid fee agreement that he originally entered into with Ms. Moreno in 1978 is something that we've been trying to get in discovery with this Rico case that's in district court that was the subject of this appeal because the trustee was kicked out because of the Barton Doctrine and that's what led to the issue of this appeal. Mr. Shallon is still a defendant there. And right now we're trying to get discovery, written discovery, which he doesn't want to produce. The State Bar must have that hybrid agreement. They have it for most of them, but not all. See, Ms. Moreno, this is a case that goes back to 1978. So they don't have anything for Ms. Moreno. And we have been working with the State Bar, actually. They're very aware of our allegations. But, you know, we have to do our own lawsuit and get our own discovery. But Mr. Shallon thus far has not been willing to cooperate. He won't respond to any discovery. He's pled the fifth. Thank you very much. All right. Get on to all stage. Okay.
judges: Pregerson, W. Fletcher, Bybee